JOHN A. KALEMBACH v. THE MICHIGAN CENTRAL RAILROAD COMPANY.

*Trial—Erroneous instructions to jury—Measure of damages—Error without prejudice—Pleading—Contributory negligence.*

1. The law does not presume that a jury in a negligence case, which found a verdict for the plaintiff notwithstanding erroneous instructions by the court upon the law of negligence, were prejudiced thereby in their assessment of damages.

2. A declaration in a negligence case in which the only allegations of special damages were "that plaintiff had been put to great expense in procuring medicine, medical attendance, and care, in which he had expended the sum of $500 for physicians' services, nurses, and help," and that he was "greatly and permanently injured, suffered great physical and mental pain, and became sore, sick, lame, and languishing," is not sufficiently specific to admit testimony of any permanent injury.

3. The question of the contributory negligence of the owner of a runaway team, who takes it into a railroad freight-yard, and in close proximity to tracks over which cars are liable to pass at any time, is to be determined by the jury.

Error to Washtenaw. (Kinne, J.) Argued May 13, 1891. Decided October 9, 1891.

Negligence case. Plaintiff brings error. Affirmed. The facts are stated in the opinion.

*Sawyer & Knowlton,* for appellant, contended:

1. A trial judge, in charging the jury, should present the substantial issues of the case, and state the principles of law that govern the rights of the parties, whether any specific instructions are requested or not; citing *Barton v. Gray,* 57 Mich. 622.

2. The facts disclosed by the evidence bring this case squarely within the rule that, where the conduct of the defendant discloses such a degree of indifference to the rights of others as to be characterized as recklessness, the doctrine of contributory negligence. does not apply, and the court should have so charged the jury. At least, there was evidence tending to show that the conduct of the defendant's servants was wanton, willful, or reckless in driving the cars down upon plaintiff without notice to him; citing *Shumacher v. Railroad Co.,* 39 Fed. Rep. 178; *Noble v. Cunningham,* 74 Ill. 51; *Matta v. Railway Co.,* 69 Mich. 109, 113; *Bouwmeester v. Railroad Co.,* 63 Id. 557; *Battishill v. Humphreys,* 64 Id. 514; Beach, Cont. Neg. § 22, p. 69; 2 Wood, Ry. Law, 1258, 1259.

3. The evidence also tends to prove that the conductor and trainmen in charge of the train saw the plaintiff's position, and heard him request them to hold on a second until he could get out, in time to have averted the injury, but, instead of stopping or attempting to stop the cars, they pushed down upon him, which management of the cars was characterized by negligence, and was equivalent to misdoing; citing *Shumacher v. Railroad Co.,* 39 Fed. Rep. 177–179; Cooley, Torts, 674; Patterson, Ry. Acc. § 55; *Price v. Railroad Co.,* 3 Amer. & Eng. R. R. Cas. 365.

4. The court instructed the jury that the plaintiff must *satisfy* them as to defendant's negligence, which must mean *beyond all doubt,* when he is only required to prove his case by a preponderance of evidence; citing *Mynning v. Railroad Co.,* 67 Mich. 677.

5. It was error to instruct the jury that "the plaintiff had no right to go upon defendant's premises, and place his team in the position he did, and shut his eyes, and demand that the company should not injure him. The mere fact of his being

injured by reason of a car being backed into the one from which he was unloading is not of itself sufficient to render the company liable,"—because—

a—The plaintiff, having gone upon the defendant's grounds to receive a consignment of barrels, was lawfully there; citing Beach, Cont. Neg. § 17, p. 55; *Watson v. Railway Co.*, 66 Iowa, 164. He went to the place the defendant had provided to receive the contents of the car, and occupied the only place provided by defendant for him to occupy. He was there under a sort of an implied warranty upon the part of the defendant that he should not be injured by negligence upon the part of the defendant while there conducting his business; citing Patterson, Ry. Acc. § 208; *Railroad Co. v. Martin*, 41 Mich. 667; and he was under no obligation to keep his eyes open (that is, on the watch). He could not be charged with negligence because he failed to anticipate some particular act of negligence on defendant's part; citing *Iltis v. Railway Co.*, 40 Minn. 273; *Railroad Co. v. Martin*, 41 Mich. 667; and he had a right to give his undivided attention to his work, and was justified in assuming that the defendant would not molest him, or render his position hazardous, without giving him notice; citing *Railway Co. v. Goebel*, 119 Ill. 515; and the defendant owed him the duty of such care as is necessary for the safety of all persons engaged as plaintiff was, and it was not for defendant's employés to close their eyes, and excuse themselves by saying that they did not know that any one was being imperiled; citing *Watson v. Railway Co.*, 66 Iowa, 164.

b—The mere fact that plaintiff was injured by reason of a car being backed into the one from which he was unloading was negligence *per se*, and, unexplained, was sufficient to render the defendant liable; citing Patterson, Ry. Acc. §§ 375, 377; *Watson v. Railway Co.*, 66 Iowa, 164; *Noble v. Cunningham*, 74 Ill. 51; *Shumacher v. Railroad Co.*, 39 Fed. Rep. 174; *Mitchell v. Railway Co.*, 51 Mich. 236.

*Henry Russel*, for defendant.

GRANT, J. It is conceded in this case that the court properly instructed the jury upon the measure of damages, but it is claimed that the court erroneously instructed them on the questions of negligence involved. Upon all these questions the jury found for the plaintiff, and I deem it unnecessary to discuss them.

It is insisted that the jury were probably prejudiced upon the measure of damages by improper instructions upon the law of negligence. I cannot accede to this proposition. The law casts no such reflection upon honest and intelligent jurors. The law does not presume that a jury, which found the defendant liable notwithstanding erroneous instructions by the court, has been prejudiced thereby in their assessment of damages, especially in a case like the present one. The verdict was for $150. What should have been the amount of damages so that the Court would say that they were not probably prejudiced? The result of this rule would be that a court must correctly instruct the jury upon all branches of every case, in order to avoid prejudicing the jury in their assessment of damages.

But, in determining the question as applied to the present case, it is proper to consider the allegations in the declaration as to the injury and the consequent damages, and the proofs. The only allegation of special damages is—

"That plaintiff had been put to great expense in procuring medicine, medical attendance, and care, in which he had expended the sum of $500 for physicians' services, nurses, and help."

It contains the general allegation that he was—

"Greatly and permanently injured, suffered great physical and mental pain, and became sore, sick, lame, and languishing."

No claim is made of injury to his horses or wagon. He called no physician, and expended no money for nursing, medicine, or help. There is no evidence that Dr. Champlin attended plaintiff, at any time, in consequence of sickness claimed to have been the result of this accident. There was no evidence that plaintiff was unable to attend to his work for more than two weeks,

and this testimony does not come from the plaintiff himself, but from his son, who *thought* he was in bed four or five days, and that it was some two weeks before he got out. The declaration was not sufficiently specific to admit testimony of any permanent injury. No physician was called for the plaintiff, and the testimony of any permanent injury was of too indefinite a character to form any reasonable basis for an award of damages. Plaintiff's testimony on this point is as follows:

"I am hardly a day without headache ever since. My off side is kind of not exactly right. I cannot remember as well as I use to before I got hurt."

The evidence in regard to the headaches was stricken out by the court. Certainly no one would contend that the statement, "my off side is kind of not exactly right," would furnish any basis for the jury to award damages. How was it not right? and why was it not right? were questions the jury must answer; and there was nothing to connect this trouble, whatever it was, with the injury. How much should the jury have awarded because he could not remember as well as he did before? It would be absurd to base damages upon such evidence.

The testimony of his son John is no more satisfactory. It is as follows:

"Since the injury I have noticed that father was sickly like a great many times, and seemed to be almost out of his head, and would refuse to eat his meals, and the like of that; and, furthermore, he has had one or two sick spells since that, and he always gets them when he does something that he stoops over."

The other son testified:

"Since that time his mind does not seem to be as it was before, and his health has not been as it was before."

This loose and indefinite testimony constitutes all the
87 Mich.—33.

evidence of any permanent injury there is in the case. The jury evidently ignored it as of no value, as, indeed, they should have done. I think the court would have been justified in instructing the jury that there was no evidence of any permanent injury for them to consider. If there was no permanent injury, the damages assessed were ample under the proofs.

There was evidence from the plaintiff's own witnesses that plaintiff had a runaway team at the time, and that this same team had run away with him and with others before. If he took such a team into this place, it was a proper question for the jury to determine whether he was guilty of negligence which contributed to the accident.

Under this record, I see no reason for holding that the jury were prejudiced by the alleged erroneous instructions. The errors, if any, were certainly not glaring ones.

Judgment should be affirmed.

CHAMPLIN, C. J., and MORSE, J., concurred with GRANT, J.

MCGRATH, J. *(dissenting)*. Defendant's freight station at Chelsea is immediately west of Main street. The main siding is north of the main track. Just north of this siding, and near Main street, is Henning's apple warehouse. North of Henning's warehouse is Kempf's warehouse, the easterly end of which is near Main street, and the westerly end of which extends beyond Henning's warehouse. Another side track lies just south of Kempf's warehouse, with sufficient room between this side track and Henning's for a narrow roadway, which is used for the receipt and delivery of freight, and it was customary to load and unload freight upon this way. A flagman was on watch at the street crossing.

At the time of the accident, two box-cars stood on the

side track opposite Kempf's warehouse. Plaintiff, with his team and wagon, on which was a hay-rack, was getting a load of barrels from the westerly car of the two named. His team faced the east, and stood just west of the easterly car, the two cars being a few feet apart. One Campbell, who was Kempf's foreman, was throwing the barrels from the car to the wagon, plaintiff was placing them upon the wagon, and one of plaintiff's hired men stood upon the ground and held the reins. Plaintiff was busy arranging the barrels, as they were being thrown upon the wagon faster than he could handle them. Another box-car stood upon the track some little distance west of the car at which plaintiff was engaged, and another car still west of that one. A west-bound freight came in upon another siding, which was south of the main track. The engine was detached, and backed in upon this side track, some distance from where plaintiff stood. No one in that vicinity was aware that the intention was to back up to the car at which plaintiff was stationed, as the conductor who was directing the movement of the engine was within two or three rods of where they stood. No one realized there was any danger until the next car west of plaintiff commenced to move east, when some one called to plaintiff.

He says:

"The first thing that attracted my attention, with regard to the danger of cars coming down there, was a gentleman, whom I did not know, saying to me, he did not know but they were going to move those cars in there. Then I stopped handling the barrels, and turned around, and just then the conductor came right across from behind the buildings, and made motions with his hands. I hallooed to him twice before he turned round; then he turned round, and I said, 'Are you going to back in here?' He said he thought so. I said, 'Just hold on a second, and let me get out of here;' and I told my hired man to throw up the lines to me, and he did, and before

I fairly got hold of the lines the cars came down against the car loaded with barrels, and struck it so hard that it moved right east, along by the horses, and the horses were so scared I didn't know whether they would drop down or not. They got up in a minute, and jumped. I hardly had hold of the lines with one hand. The striking of the car made noise enough to scare me, to say nothing of scaring a team. The car went with me until I got thrown over, and I don't know how much further. I don't know whether the car ran against the hay-rack or it struck against the building, but the first thing I knew I was rolling off behind, and the hay-rack was torn to pieces."

The conductor was within two rods of plaintiff when plaintiff spoke to him. The car that stood east of that at which plaintiff was engaged was struck so hard that it was driven out into Main street.

Plaintiff complains of the instructions given to the jury. In the charge the court used the following language:

"The theory of the plaintiff in this case, upon which he bases his claim to recover against the defendant, Michigan Central Railroad Company, is that this company has been guilty of negligence,—that is to say, that this railroad company has done or omitted to do some act or deed which good and prudent railroading cannot sanction,—and that this negligence caused the injuries alleged.

"In order for the plaintiff to recover in this case, he must satisfy you, by a fair preponderance of evidence, first, that he himself has not been guilty of contributory negligence; that is to say, if the want of ordinary care and prudence on the part of the plaintiff in any degree contributed to this accident, the plaintiff cannot recover. In other words, if the plaintiff, by the exercise of due care and ordinary caution, could have avoided this injury, he cannot recover. I will state that to you again: In order for the plaintiff to recover in this case, he must satisfy you, by a fair preponderance of evidence, first, that he himself has not been guilty of contributory negligence, for, if the want of ordinary care and prudence on the part of plaintiff in any degree contributed to this

accident, the plaintiff cannot recover. In other words, if the plaintiff, by the exercise of due care and ordinary caution, could have avoided this injury, he cannot recover. If, from the evidence in this case, you find that the plaintiff was not guilty of this contributory negligence which I have just described, then, for him to recover, he must further satisfy you that the defendant corporation, the Michigan Central Railroad Company, was itself guilty of negligence; that is, that the defendant company has failed to exercise that degree of care, caution, and prudence which good railroading demands.

"In a general way that covers the law in this case; but at the request of plaintiff's counsel I give you the following instructions:

"'It was the duty of the defendant * * * to have refrained from doing anything, or permitting anything to be done, without notice to the said plaintiff, while and so long as he was engaged in receiving and unloading said barrels from said car in manner aforesaid, that should create any *unnecessary and unusual* noise liable to frighten horses of ordinary gentleness. * * * *

"'It was the duty of the said defendant, while said plaintiff was so engaged in receiving and unloading the said barrels from said car with due diligence, to refrain from creating any *unusual and unnecessary* noise, or performing any act that would frighten horses of ordinary gentleness.'

[The words 'unusual' and 'unnecessary' were inserted by the court.]

* * * * *

"It was the duty of the plaintiff, when he entered upon the defendant's grounds, to observe the premises, and to do all that he reasonably could to guard against receiving injuries while upon such premises; and the greater the risk which he took in placing his team between the box-car and the warehouse, and the more dangerous the position was, the greater should have been his care to look out for and avoid all danger; and if he failed to exercise such care, and such omission on his part contributed to the injury, he cannot recover.

"It is for the plaintiff to show, by a fair preponderance of evidence, that the defendant was guilty of negligence in permitting a car to strike against the one from which the plaintiff was unloading barrels. The plaintiff must, therefore, first establish that the defendant knew, or, by the exercise of that prudence and care which good rail-

roading demands, could have known, that plaintiff's team and wagon were between the box-car and the warehouse, and that defendant, after receiving such knowledge, or in the exercise of that prudence and care which good railroading demands, might have prevented the accident.

\* \* \* \* \*

"The conduct of plaintiff's horses before the coming car struck the car containing the barrels may be considered by you in determining whether it was safe and prudent for the plaintiff to employ that team upon that service. If the plaintiff's team was fretful and easily frightened, and you find that gentle horses, not affraid of box-cars in close proximity, would not have run away under the circumstances, and that plaintiff was therefore guilty of negligence in driving said team into this place of danger, then plaintiff cannot recover.

\* \* \* \* \*

"If you find that plaintiff knew or had notice that the other car might collide with the car containing the barrels, and that he might have avoided the injury by taking advantage of such knowledge, he cannot recover.

"It was the duty of the plaintiff, when he went upon defendant's premises, to realize that he was placing his horses in a position where the slightest motion of the car might cause them to run away; and it was his duty to keep a reasonable lookout up and down the side track, and to avoid, as far as he reasonably could, being left in that position when other cars should be coming. If he omitted to exercise any of those precautions, and was injured thereby, he cannot recover."

The plaintiff was rightfully, lawfully, and necessarily upon the defendant's grounds, in the ordinary course of business. He was in plain sight of the operators of the engine. There was testimony that he was seen by and spoke to the conductor, and defendant offered no testimony to relieve itself from the charge of negligence. Plaintiff asked the conductor, who was within two rods of plaintiff, if it was his purpose to back in there, and the conductor replied, "I think so," or "I should say so," and continued to direct the backing of the train in

upon the car at which plaintiff was engaged. There was no dispute as to these facts. It was clear, not only that the defendant could have known and should have known, but that it actually did know, of plaintiff's presence. There was no testimony tending to show that any warning had been given to plaintiff. The defendant's negligence consisted in doing what it did, knowing of plaintiff's presence, without warning, rather than in the "failure to avoid" or "prevent" the accident. Plaintiff was entitled, while in that position, to the company's protection. The testimony showed a disregard of plaintiff's presence, and of the company's duty to him under the circumstances. He was not bound to presume that the cars might be or would be kicked against the car from which he was getting a load, with such force and violence as' to kick the next car a distance of 30 or 40 feet, without any notice or warning to him. He had a right to expect that notice would be given before such an act was attempted. While, if he saw the train coming in that direction, it was his duty to do what he could to avoid the accident, he had no reason to expect that the train would be backed in upon him without warning, and that degree of watchfulness and caution was not required of him that would be required of a trespasser, or of one crossing the tracks without the knowledge of the trainmen. The position of plaintiff was not necessarily a dangerous one, provided the defendant exercised proper care, and did not violate its duty towards him.

"The law does not require men to be on a constant lookout for dangers that cannot be expected to exist so long as there is ordinary care used by those whose action is the only thing that can cause danger." *Grand Rapids & I. R. R. Co. v. Martin*, 41 Mich. 670.

It cannot be said, therefore, that it was plaintiff's duty to "keep a lookout up and down the track" for

the unexpected to happen; nor could plaintiff be expected
to "know or have notice that other cars might collide
with that car," and it was error to instruct the jury
that, if he might have avoided the injury by taking
advantage of "such knowledge," he could not recover.

Again, the court says it was the duty of the plaintiff,
when he went upon defendant's premises, to realize that
he was placing his horses in a position where the
slightest motion of the car might cause them to run
away. The plaintiff had no reason to expect any motion
of the car, and the movement of the car actually caused
was not in any sense a slight or the slightest motion.
Plaintiff's horses did not move, nor did they appear
fretful or frightened, till this occurred. The plaintiff
was not negligent for being where he was, nor does the
testimony tend to show any negligence upon his part, at
least until he became aware that the train was moving
down upon him, and even then it is doubtful if he was
liable to the charge of contributory negligence.

Plaintiff properly complains of the words "unnecessary
and unusual" in the clause "any unnecessary and
unusual noise." The noise created was that naturally
resulting from the doing of the act complained of. It
was neither unusual nor unnecessary, but followed neces-
sarily and usually from the violent kicking of several
cars against each other. The doing of a necessary act,
or the making of a necessary and usual noise, at an
improper time, and without regard to the peril of others,
may be negligence.

These instructions were clearly erroneous. The court
seems to have applied the law as to a trespasser, rather
than as to one upon defendant's premises by invitation,
and in the legitimate use of defendant's station grounds
in the course of the very business in which defendant
was engaged. The law makes a clear distinction between

the person who intrudes upon another's premises for his own convenience, and the one who is there by invitation. Under the same circumstances, the one may be entitled to recover, and the other may not.

Plaintiff says regarding his own injury:

"I was struck on the right side of my face. It hurt me very much. I new nothing about myself for about 15 minutes. When I came to, I was sitting on a stoop of the tavern on the other side of the railroad, about four or five rods from where I was thrown. I was hurt on my right side, clear up on my head, and was lame so I could not walk. I have never got over it entirely,— got over the injury. I am hardly a day without headache ever since. My off side is kind of not exactly right. I cannot remember as well as I used to before I got hurt."

Another witness says:

"I saw the wagon upset, and ran over to where Mr. Kalembach was, and helped pick him up. He seemed to be unconscious, and I think he was."

One Schenk testifies as follows:

"I saw him at the time of the injury before he was taken up from the ground. He was mixed up among the barrels, wagon, rack, etc. They were on him and around him. He was senseless. I helped carry him up the street towards town. We carried him up about three rods, up in front of the old hotel, and he was pretty heavy for us, so we sat him down there, and rested him up against a post on the sidewalk, and some one made a remark about taking him inside. It seemed that was the first thing that he realized or understood, and he says, 'No, I don't want to go there; I want to go home.' And we insisted on his going. He finally wanted to have us take him up to our store, about three rods further on the same side of the street. We took him there, and fixed a place for him, and laid him down. He lay there somewhere near an hour, and kept wanting to go home. Some one spoke about having a doctor examine him, and he said h. thought he was able to ride home; we could get him home, and then he could have treatment there;

so I sent a boy up after my rig, and we got him in, and I drove him home. He complained pretty much all the way. It seemed to hurt him to ride, and he complained of his head. He had a gash on one side,—I think the right side. He said his head pained him fearfully, and he groaned, etc., pretty much all the while. There were three or four women at the house when we reached there, and some men, who assisted in taking him in. I assisted also. We put him into bed, and then I came away. There was blood on his face."

Plaintiff's son says:

"I think father laid in bed from that injury four or five days, and I think it was some two weeks or over before he got out of the house. * * * Since the injury I have noticed that father was sickly like a great many times, and seemed to be almost out of his head, and would refuse to eat his meals, and the like of that; and, furthermore, he has had one or two sick spells since that, and he always gets them when he does something that he stoops over. * * * Dr. Champlin attended my father when he was sick. He has been away from Chelsea about three years. The last I heard he was in Pennsylvania."

(Plaintiff was injured in 1886, and the trial was had in 1890.)

Another son testified:

"Since that time his mind does not seem to be as it was before, and his health has not been as it was before."

This testimony is uncontradicted. It tends to show that plaintiff received a serious and permanent injury. The jury found a verdict for $150. Plaintiff was entitled to a fair trial, and proper instructions to the jury. The instructions given did not state the law as applicable to the case made by the proofs, and were calculated to mislead and confuse the jury. This Court has held that the erroneous admission of testimony is presumptively injurious, and its reception reversible error, unless it is plain that it could not have affected the result. *Continental*

*Ins. Co. v. Horton*, 28 Mich. 173; *Shipman v. Seymour*, 40 Id. 277.

In a number of cases it has been held that the judgment will not be reversed for an erroneous instruction if, from an examination of the record, this Court is satisfied that plaintiff in error was not prejudiced. *Barton v. Gray*, 57 Mich. 622; *Township of Monroe v. Whipple*, 62 Id. 560.

"If the result could not have been different under proper instructions," or the jury "could not have been misled," or "if the instructions did not tend in any degree to prejudice," or "could not have changed the result," the judgment will not be reversed. *Case v. Dewey*, 55 Mich. 116; *Morse v. Byam*, Id. 594; *Cummings v. Stone*, 13 Id. 70; *Sinclair v. Murphy*, 14 Id. 392; *Eberstein v. Camp*, 37 Id. 176; *Finan v. Babcock*, 58 Id. 301.

Can we say that "it is plain that these instructions did not affect the result," or that we are "satisfied that they did not," or that "the jury could not have been misled," or that "they could not in any way prejudice plaintiff," or that they did not "tend in any degree to prejudice him," or that "the result could not have been different" if the jury had been properly instructed? From a careful examination of the record, I am not prepared so to find.

While it is true that the jury found for the plaintiff upon the matters to which these erroneous instructions relate, yet plaintiff's right to recover is dependent upon defendant's negligence; and who shall say that whether or not the plaintiff ·receives his full measure of compensation does not depend somewhat upon the degree of· negligence established by the testimony under the instructions given by the court? Damage alone will not

support a recovery. There must be a wrong as well as damage. Both must be found by the jury.

It cannot be said that, by the court's erroneous instructions to the jury, the wrong may be made extremely doubtful without prejudice to plaintiff. In actions in tort, where the wrong and damage are so intimately related, and both must be established to support a recovery, the mere fact that a verdict was rendered. for plaintiff will not create the presumption that erroneous instructions regarding the wrong did not affect the award of the jury. Indeed, the presumption is the other way, and the record and verdict must be such as to remove that presumption, or the judgment will not be allowed to stand. It will not do to say here that the jury did not believe plaintiff, or that his injuries were not so serious as he claimed. The presumption must be overcome, if at all, by what appears, not by speculation or the invention of possible theories.

The court's instructions were clearly erroneous, and were calculated to prejudice the jury. It does not satisfactorily appear that they did not have the effect which they were calculated to produce.

The judgment should be reversed, and a new trial ordered.

Long, J., concurred with McGrath, J.